**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **SUSAN BROOKS, INDIVIDUALLY,** | § | |
| **AND D/B/A RIVER DANCE** | § | |
| **MINATURES AND JEANNE AND** | § | |
| **BRIAN KRUG, INDIVIDUALLY, AND** | § | |
| **D/B/A WOODLAND ACRES FARM,** | § | |
| | § | |
| **v.** | § | **A-05-CA-642 LY** |
| | § | |
| **PETER AND LISA GOETTL,** | § | |
| **INDIVIDUALLY AND D/B/A** | § | |
| **MARYSTOWN MINIATURES,** | § | |
| **BLANCO VETERINARY CLINIC, INC.,** | § | |
| **AND DAVID BEHRENDS, D.V.M.** | § | |

**ORDER AND
REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
         UNITED STATES DISTRICT JUDGE

Before the Court is Defendants Blanco Veterinary Clinic, Inc's, David Behrends, D.V.M.'s

and Peter and Lisa Goettl's Motion to Exclude Plaintiffs' Expert Witness, filed September 25, 2006

(Clerk's Doc. No. 40); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to

Exclude Plaintiffs' Expert Witnesses, filed October 2, 2006 (Clerk's Doc. No. 41); Defendants'

Motion for Summary Judgment, filed October 23, 2006 (Clerk's Doc. No. 52);[1] Plaintiffs'

Memorandum of Law in Opposition to Motion for Summary Judgment, filed November 8, 2006

---

[1] The motion covers all of the named defendants.

(Clerk's Document 69);[2] Defendants' Blanco Veterinary Clinic, Inc.'s and David Behrends D.V.M.'s Motion for Partial Summary Judgment on Damages, filed October 23, 2006 (Clerk's Doc. No. 53); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Partial Summary Judgment filed November 8, 2006 (Clerk's Doc. No. 68); Defendant Blanco Veterinary Clinic, Inc.'s, David Behrends, D.V.M.'s First Amended Motion for Summary Judgment on Damages filed December 1, 2006 (Clerk's Doc. No. 80); and Defendants' Blanco Veterinary Clinic, Inc.'s and David Behrends D.V.M.'s Notice of Supplementation to First Amended Motion for Summary Judgment on Damages, filed December 5, 2006 (Clerk's Doc. No. 83). The District Court referred the summary judgment motions to the undersigned for report and recommendation, and the motion to exclude experts for resolution, pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges. After reviewing the parties' pleadings, relevant case law, as well as the entire case file, the undersigned issues the following Report and Recommendation to the District Court.

## I. BACKGROUND

In early April 2004, Jeanne Krug traveled from Wisconsin to Blanco, Texas to take delivery of two miniature horses, Hotsy and Jazz, which had been purchased from Peter and Lisa Goettl's

---

[2] Plaintiff's memorandum, despite its title, asks for relief that judgment as a matter of law be entered for them on the issue of causation. This request for relief is inappropriate. First, to properly request such relief, Plaintiff should have filed a motion for summary judgment. Moreover, the date on which dispositive motions were due had passed by November 8, 2006 when Plaintiffs filed their motion. *See* Clerk's Doc. No. 28 (setting dispositive motion deadline of October 21, 2006).

miniature horse farm, Marystown Miniatures.[3]  Krug was picking up Jazz for her farm, Woodland

Acres, and Hotsy for Susan Brooks's farm, River Dance Miniatures.  When Krug arrived at the

Goettls, she was informed that Hotsy and Jazz were feeling under the weather, exhibiting symptoms

of "snotty nose, cough, not eating real great, fever, something like that," but that they were being

given medication for their ailments.  Exh. B8, Krug Deposition at 33-34.  Before Krug returned to

Wisconsin, she and Ms. Goettl went to Dr. David Behrends and the Blanco Veterinary Clinic

(collectively "Behrends"), the Goettls' veterinarian, to obtain a certificate of health for Hotsy and

Jazz.  *Id*. at 40-42.  Dr. Behrends issued the health certificate that day, based on his examination of

the horses two days prior.  The exam consisted of observing Hotsy and Jazz for "probably a minute"

in their respective pens.  Exh. B6, Behrends Deposition at 38-39.  Dr. Behrends did not take the

horses' temperature, pulse, check their respiration with a stethoscope, or question the Goettls about

their medical history.  *Id*. at 38-41.  In any case, Krug stated that Hotsy and Jazz looked "much

better" when she loaded them onto the trailer to transport them north.  *Id.*  at 40.

On her way back to Wisconsin, Krug picked up two more horses, and then dropped off Hotsy

in Minnesota.  Exh. B8, Krug Deposition at 35-38.  In late May (or early June), Krug and  Brooks,

at their respective miniature horse farms, experienced an outbreak of *streptococcus equi*, or,

colloquially, strangles.  *See* Affidavit of Dr. Ott; Affidavit of Dr. Dlugopolski.  Strangles is a highly

contagious bacterial infection that affects (as the Latin implies) horses.  The common symptoms of

strangles are decreased appetite, fever, cloudy discharge from the nostrils, and swollen lymph nodes.

It is possible for an ostensibly healthy horse to be a "silent shedder" of the *streptococcus equi*

---

[3]Miniature horses, as one might imagine, are small horses that are roughly equivalent in size to a medium to large sized dog.  Apparently, they are kept as pets, compete in shows, and some are even trained to be "guide horses," the equine equivalent of a seeing-eye dog.

bacteria for weeks or months.  While most horses generally recover from the disease without any long-term problems, it can cause death, especially in young foals.  People who own horses therefore take the disease seriously.  Exh. B7, Deposition of Peter Goettl at 97-98.

After discovering that she had a strangles outbreak on her farm, Brooks spoke with Ms. Goettl, who informed her that the Goettls had experienced an outbreak of strangles on their farm in December 2003 and January 2004.  Exh. B8, Brooks Deposition at 17-18.  Krug testified that she also had learned of the strangles outbreak at the Goettls farms through conversations with them during this same time period.  Exh. B8, J. Krug Deposition at 68.  Despite this outbreak at their respective farms, a bacterial culture of Hotsy and Jazz was never done to confirm that either horse was a strangles carrier.  However, Dr. Behrends testified that strangles can be diagnosed based on symptoms alone (nasal discharge, coughing, fever, and depression).  Exh. B6, Behrends Deposition at 46.  Krug further admitted that Jazz never developed any abcesses, a strong indication of a strangles infection.  Apparently, there was also never a formal strangles diagnosis by a veterinarian as to Hotsy or Jazz.  There was, however, testimony that by the time the strangles outbreak had occurred at Brooks's and Krug's farm, there was no point in testing Hotsy or Jazz because "it wasn't worthwhile.  It was past the time."  Exh. B8, Krug Deposition at 213; Exh. 8, Brooks Deposition at 69, 161.

In any event, it is undisputed that both Brooks and Krug experienced a strangles outbreak at their respective farms, and that before they were introduced into the Plaintiffs' respective herds, Hotsy and Jazz had been quarantined.  As a result of the outbreaks, Plaintiffs allege extensive damages, both monetary and emotional.  Krug experienced two strangles outbreaks at her farm – May-August 2004 and November 2005-February 2006 – and experienced "loss of sleep, being very

anxious and very emotional, very – just rot out, the no sleep, anxiety over what was happening, whether you would walk into the barn and find somebody dead in the morning." Exh. B8, Krug Deposition at 90, 98. Her doctor prescribed her anti-anxiety medication. *Id.* Krug also experienced marital difficulties, partly because of the cost of treating the animals. *Id.* at 91-95. Brooks experienced some similar problems, testifying that she "went through [her] whole 401(k)", that the experience of having strangles on her farm was "overwhelming . . . it's just what I went through during the time was unbelievable, sick horse after sick horse, copious amount of money going out that I didn't have." Exh. B8, Brooks Deposition, at 83-84. She further testified that she "went through from losing all my money to major depression and worrying about how in God's name am I going to pay my bills." *Id.* She also testified that she did not seek any medical treatment because she could not afford to purchase medical insurance. *Id.* at 85.

On August 15, 2005 Plaintiffs filed suit in federal court based on diversity jurisdiction alleging causes of action against the Goettls, Behrends, and Blanco Veterinary Clinic. On November 30, 2006, the parties notified the Court that the claims against the Goettls had been settled. *See* Clerk's Doc. No. 76. Thus, the only claims remaining in the case are those against Dr. Behrends and the Blanco Veterinary Clinic. Against these defendants, Plaintiffs bring claims of negligence and veterinary malpractice, negligence *per se*, breach of express warranty, fraud, negligent misrepresentation, strict products liability, promissory estoppel, intentional infliction of emotional distress, breach of contract, and conspiracy.

Behrends moves for summary judgment on the issue of causation and also moves, separately, for partial summary judgment on damages. *See* Clerk's Doc. Nos. 52 and 53. On September 27, 2006, Defendants filed a Motion to Compel and For Discovery Sanctions because of the Plaintiffs'

delinquency in turning over relevant documents concerning damages.  *See* Clerk's Doc. No. 38. After a hearing on the matter, the Court, in an October 31, 2006 Order, granted the motion in part, and denied it in part.  *See* Clerk's Doc. No. 63.  Specifically, the Court ordered that Plaintiffs had until November 13, 2006 to produce any additional documentation relating to damages, that Plaintiffs had to submit to additional depositions because they had amended their disclosures, that Brian Krug must make himself available for deposition, and that Plaintiffs must produce documentation, if any, as to Hotsy's or Jazz's strangles diagnosis.  *Id*.  The Court also permitted Defendants to file any additional or supplemental dispositive motions necessitated by this additional damages-related discovery, with a new deadline of December 1, 2006.  On November 9, 2006, the District Court referred the summary judgment motions for report and recommendation (*see* Clerk's Doc. No. 72), and on November 30, 2006, the District Court referred Defendants' motion to exclude Plaintiffs' expert witness for resolution.  *See* Clerk's Doc. No. 79.  Finally, on December 1, 2006, Behrends filed an amended motion for summary judgment, adding additional factual material learned at the November depositions.  *See* Clerk's Doc. No. 80.  The Court will address the expert witnesses first.

## II.  MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESS

Defendants first move to exclude Plaintiffs' expert witnesses, Drs. John Madigan and Kathryn Ott.  Federal Rule of Evidence 702, amended post-*Daubert* in 2000, provides that a witness "qualified as an expert . . . may testify . . . in the form of an opinion . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  FED. R. EVID. 702.  Amended Rule 702 reflects the Supreme Court's decisions in *Daubert* and its progeny,

emphasizing the district courts' broad latitude in weighing the reliability of expert testimony for admissibility. *See e.g.*, *Daubert v. Merrell Dow Pharm., Inc*, 509 U.S. 579, 591 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). *Kumho Tire* clarified that the Rule 702/*Daubert* analysis applies to all proposed expert testimony, including nonscientific "technical analysis" and other "specialized knowledge." 526 U.S. at 141.

It goes without saying that *Daubert* clarified the district courts' gate-keeping function: the court must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case. The Supreme Court listed several non-exclusive factors to guide courts in their screening function: whether the proposed evidence or theory "can be (and has been) tested;" whether it "has been subjected to peer review and publication;" whether it has been evaluated in the light of "potential rate[s] of error;" and whether the theory has been accepted in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94.

The *Daubert* factors remain relevant to the determination of the reliability of expert testimony under Rule 702, as amended. *See* FED. R. EVID. 702 advisory committee's note (2000 Amendment). The 2000 amendments to Rule 702 also reflect the Supreme Court's determination that the reliability analysis must remain flexible; not every *Daubert* factor will be applicable in every situation, and a court has discretion to consider other factors it deems relevant. *Kumho Tire*, 526 U.S. at 151. Although the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does not judge the expert conclusions themselves. *Daubert*, 509 U.S. at 594-95.

Defendants argue that Madigan's report is not reliable because there was never a definitive strangles diagnosis, the report refuses to acknowledge other possible sources of the strangles

outbreaks on Plaintiffs' horse farms, and it impermissibly relies on the treating veterinarians diagnoses of strangles.[4]  *See* Defendant's Motion to Exclude Plaintiffs' Expert Witnesses at 5, 7-8 (Clerk's Doc. No. 40).  *Viterbo v. Dow Chemical Company* held that an expert need not "disprov[e] or discredit[ ] every possible cause other than the one espoused by him" as long as his opinion does not "simply pick[] the cause that is most advantageous to [Plaintiff's] claim" while ignoring other relevant evidence.  826 F.2d 420, 422, 424 (5th Cir.1987); *see also Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("In the context of admissibility of expert testimony, this court has noted that '[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury.'); *First United Financial Corp. v. U.S. Fidelity & Guar. Co.*, 96 F.3d 135, 139 (5th Cir. 1996) (*Viterbo* has come to stand for the proposition that, '[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.'"); *McNabney v. Laboratory Corp. of America*, 153 Fed. Appx. 293, 295 (5th Cir. 2005) (discussing *Viterbo* in the context of admissibility of medical expert testimony).

---

[4]Defendants also argue that Madigan's opinion as to his determination of the cause of the strangles outbreaks have not been tested or subjected to peer review.  They state, "Certainly, there is a methodology for determining the causation of these strangles outbreaks that has been subjected to peer review, but neither Madigan nor Ott has performed it adequately or at all on the horses they incriminate."  *See* Defendants' Motion to Exclude Plaintiffs' Expert Witnesses, at 9 (Clerk's Doc. No. 40).  That may or may not be the case, but the Court is in no position to evaluate that argument because Defendants do not explain what that methodology is and how Drs. Madigan and Ott fall short.  Regardless, what is more important is that Madigan's Report is only claiming that, given the evidence his clients placed before him, the most plausible source of the strangles is Hotsy and Jazz; he is not engaged in a novel method of diagnosing strangles (something which would likely be in need of peer-review scrutiny).  *See* Madigan's Report at 6, attached as Exh. A to Defendants' Motion for Summary Judgment (Clerk's Doc. No. 52).  Moreover, insofar as the argument is that there was no culture done for either Hotsy or Jazz, the argument is undermined by Behrends's deposition testimony that the common method to diagnose strangles is through clinical signs, rather than a culture.  Exh. B6, Behrends Depo. at 85-88.

Defendant's argue that because Brooks' horses exhibited some clinical symptoms that could be consistent with strangles six, three, and two years, respectively, before the outbreak that caused this litigation, and because there were horses other than Hotsy and Jazz in the trailer that Krug used to transport the horses, Madigan's report and testimony must be excluded because it failed to exclude other possible contamination sources (and simply relied on unverified hearsay to establish his conclusion).  Setting aside the fact that experts may rely on hearsay evidence in forming their opinions, *see First Nat. Bank of Louisville v. Lustig*, 96 F.3d 1554, 1576 (5th Cir. 1996), this argument would be more persuasive if Madigan had simply, like the doctor in *Viterbo*, relied *only* on what Plaintiffs' had told him to arrive at his conclusion.  He did not.  Madigan relied on nearly the entire record, and, in addition, conferences with veterinarians, the Plaintiffs, and veterinary medical records in reaching his conclusion.  Furthermore, Defendants' argument that Madigan's report must be excluded because Brooks' horses exhibited *some* clinical symptoms that could be consistent with strangles six, three, and two years, respectively before the outbreak that caused this litigation is a red herring.  *See* Defendants' Motion for Summary Judgment at 6.  There is no evidence in the record that strangles has an incubation period of years.  Therefore, Defendants have failed to show any objective reason why Madigan should have considered that possibility in the first instance.

Defendants' other attacks on the report – that there is no diagnosis of strangles, therefore Madigan cannot offer reliable causation testimony and that the report impermissibly relies on the treating veterinarians opinions – are also problematic.  Defendant Behrends testified that it is common to diagnose strangles by the tell-tale symptoms of coughing, nasal discharge, low appetite, etc., and that a veterinarian "can be 95% sure" that his diagnosis is correct based solely on these

9

symptoms.  Exh. B6, Behrends Deposition at 87.  It is strange, therefore, to attack Madigan's report as unreliable for utilizing the same methodology as the defendant veterinarian uses; it is also unconvincing.  Further, it is equally unconvincing for Defendants to argue that Madigan's reliance on the treating veterinarians for his conclusion is so unreliable that his testimony must be excluded.  To reiterate, there is no evidence that Madigan relied *soley* on this or that piece of evidence.  Instead, it is clear that he relied on a number of sources to reach his conclusion, which, taken as a whole, provide a reliable basis his opinion.  Accordingly, Defendants' Motion to Exclude Plaintiffs' Expert Witnesses is DENIED.

## III.   SUMMARY JUDGMENT MOTION

### A.     Standard of Review

Rule 56 permits any party to a civil action to move for summary judgment upon a claim on which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law.  *Strong v. B.P. Exploration & Production, Inc.*, 440 F.3d 665, 668 (5th Cir. 2006).  The motion strikes at the heart of the claim, in effect arguing that given the established and admitted facts "the moving party is entitled judgment as a matter of law." *Margolis v. Deason*, 464 F.3d 547, 550 (5th Cir. 2006) (quoting Fed. R. Civ. P. 56(c)).  If the moving party meets the initial burden of showing there is no genuine issue of material fact, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000).  In determining whether there is a genuine issue of material fact, all facts must be evaluated in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-movant must go beyond the pleadings and come forward with specific facts

indicating a genuine issue for trial to avoid summary judgment. *Piazza's Seafood World, L.L.C. v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006). Summary judgment is appropriate if the non-movant fails to show the existence of a fact issue on at least one element essential to that party's case. *Id*.

**B.    Summary Judgment Analysis**

There are two summary judgment motions before the Court: Defendants' Motion for Summary Judgment (relating to causation); and Defendants' Partial Motion for Summary Judgment on Damages. They are analyzed in turn.

**1.    Causation**

In what amounts to the same argument presented in their motion to exclude Plaintiffs' expert witnesses (in fact many of the same sentences, verbatim, appear in both motions), Defendants focus their first summary judgment motion on Plaintiffs' "causation expert" John E. Madigan, a veterinarian. To the extent it can, the Court will refer to its analysis above. However, the context and standard of review is different on the summary judgment motion, and accordingly the Court to some extent must cover the same ground twice.

Defendants contend that Madigan makes a number of "false assumptions" and he is "reliant on possibility, speculation, and surmise" in his expert report. *See* Defendants' Motion for Summary Judgment at 9, 14. Defendants assert that Madigan's false assumptions are: (1) that Hotsy and Jazz had contracted the strangles at the Goettls' farm; (2) that Plaintiffs' horses never had nor exhibited symptoms of strangles prior to Hotsy's and Jazz's arrival; (3) Behrends saw Hotsy and Jazz exhibit clinical symptoms of strangles; and (4) none of the other horses in the trailer that transported Hotsy and Jazz to Brooks' and Krug's farms were the source of the strangles. Furthermore, Defendants argue, causation cannot rest on Madigan's consultations with veterinarians (Drs. Ott and

11

Dlugopolski) who treated Brooks' and Krug's horses – and determined that there was a strangles outbreak – because this is simply one veterinarian relying on another's word to create causation.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Primrose Operating Co. v. National American Ins. Co.*, 382 F.3d 546, 562 (5 th Cir. 2004). "As the Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] makes clear, . . . the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* However, "[w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *In re Segerstrom*, 247 F.3d 218, 227 (5th Cir. 2001).[5]

Defendants' central argument is that Hotsy and Jazz were neither cultured for nor diagnosed with strangles. However, Dr. Behrends' testimony, and other evidence, undermines the cogency of their argument. Behrends testified that it is the more common, and pecuniarily prudent, method to diagnose strangles based on clinical signs, rather than a culture. In addition, the Court, being mindful that it must draw all inferences in favor of the Plaintiff at this stage, notes that the evidence shows that even if a culture had been performed on Hotsy and Jazz at the time the outbreak it would not have been dispositive of anything because, even if they were the cause of the strangles outbreak, the bacteria very well might not have still been in their systems. To put it differently, a culture could

---

[5]Both parties apparently agree that Texas law applies and Texas law is in accord with the rule that "it is not so simply because an 'expert says it is so." *Merrell Dow Pharma., Inc. v Havner*, 953 S.W.2d 706, 712 (Tex. 1997) (citing *Viterbo*, 826 F.2d at 421).

not have definitively fingered Hotsy and Jazz one way or the other as the culprits.  *See* Plaintiffs'

Memorandum at 4 (after six weeks a horse usually does not harbor the strangles bacteria); *see also*

Exh. B8, Krug Deposition at 213; Exh. 8, Brooks Deposition at 69, 161.  It is also noteworthy that

the Goettls admitted to Plaintiffs that they had experienced, only a few months before Plaintiffs

picked up Hotsy and Jazz, a strangles outbreak on their farm.  This is buttressed by the Journal of

Internal Medicine's consensus report on strangles which notes that an otherwise outwardly healthy

horse can still transmit the strangles bacteria for at least six weeks after clinical signs have

disappeared.  *See* Plaintiffs' Memorandum at 4 (Clerk's Doc. No. 69).  Dr. Behrends agreed with the

consensus report's findings.  Exh. B6 Behrends Deposition at 40-49.  Furthermore, in the months

leading up the purchase of Hotsy and Jazz (circa January 2004) up through and after that purchase,

Behrends regularly prescribed antibiotics to the Goettls' horses.  *Id*. at 82-106.  Most saliently for

present purposes, all of this was the evidence relied upon by Madigan in preparing his expert report.

*See* Dr. John E. Madigan's Expert Report at 1-2.  The accumulation of this evidence is more than

enough to create a genuine issue of material fact as to whether Hotsy and Jazz were the source the

strangles outbreak at Plainitffs' horse farms.

The rest of Defendants' arguments miss the point; they are really no more than a veiled

attempt to try their case in the guise of a summary judgment motion.  It is irrelevant whether Brooks'

horses exhibited *some* clinical symptoms that could be consistent with strangles six, three, and two

years, respectively before the outbreak that caused this litigation.  *See* Defendants' Motion for

Summary Judgment at 6.  There is no evidence that the bacteria that causes strangles is so hardy that

it can linger for years.[6]  Nor does it matter, insofar as causation is concerned, what Dr. Behrends did or did not see when he examined Hotsy and Jazz.  *Id*. at 7-8.  This argument is better directed at whether or not his examination was one that a reasonable veterinarian would deem appropriate, not whether Hotsy and Jazz caused the strangles outbreak.  That is, while Defendants take the opportunity to defend Behrends' action against Madigan's opinion that his examination was not up to professional standards, it simply does not matter for purposes of a summary judgment motion on the issue of causation.  Moreover, it does not matter that Madigan does not exclude each of the other horses that were picked up and dropped off during Krug's trip to Texas as the possible causes of strangles.  *Id*. at 8-9.  Nowhere is it written an expert must "disprov[e] or discredit[ ] every possible cause other than the one espoused by him."  *Viterbo*, 826 F.2d at 424.  Moreover, even granting for the sake of argument that Madigan's Report is shaky, the Court's role as evidentiary gatekeeper is not to "replace[] the adversary system."  *Primrose*, 382 F.3d at 563.

And this dispute is really at the heart of the parties' experts' disagreement (and the heart of the entire case): Madigan believes that Hotsy and Jazz were the carriers of the strangles bacteria, while Defendants' expert, Dr. Corinne Sweeney, believes that Madigan's report fails to account for other possible sources.  *See* Affidavit of Corrine R. Sweeney, Exh D. (Clerk's Doc. No. 52).  This is precisely the type of dispute that a jury trial is best suited to resolve, and also precisely the type of dispute which it is inappropriate to resolve at summary judgment.  The same is no less true of

---

[6]Defendants attempt to argue that "The possibility was even raised that Brooks' colt gave strangles to the Goettls' horses in the Fall of 2003." *See* Defendants' Motion for Summary Judgment at p. 6.  This is based, however, on a partisan reading of Brooks' deposition testimony; a more dispassionate reading of her testimony reveals that she was simply recalling the content of a conversation with Peter Goettl where he admitted that he had suffered a strangles outbreak on his farm, but that he tried to blame her for bringing strangles to his farm in the Fall of 2003. *See* Exh. B8, Brooks Deposition at p. 147-48.

Defendants' argument that Madigan's report cannot rely on his conferences with Drs. Ott and Dlugopolski.  This contention would be more compelling if, like in *Viterbo*, this was the only evidence that Madigan relied on his report.  However, as catalogued above, Madigan relied on a number of different sources, and those sources create a fact issue as to causation.

In sum, this is not a case in which the sources "upon which an expert's opinion relies is of such little weight . . . that [the] testimony would not actually assist the jury in arriving at an intelligent and sound verdict."  *Viterbo*, 826 F.2d at 422.  Defendants' attempt to place each piece of the summary judgment evidence in a vacuum – and then argue why causation cannot be found based on that piece – fails.  There is not a fact question as to causation merely because Madigan says it is so, instead there is a fact question because the sources on which Madiagan's report relies, aggregated, create one.

**B.     Damages**

In their Partial Motion for Summary Judgment on Damages, Defendants argue that Plaintiffs are not entitled to (1) lost profits damages; (2) mental anguish damages; and (3) lost wages damages.  First, however, the Court must deal with Defendants' amended motion for summary judgment on damages.  The factual and procedural background portion of that motion concerns the proceedings of the latest round of deposition testimony – ordered by this Court – of Brooks and Krug.  For example, at Krug's deposition, she was unable to explain the many discrepancies between her alleged income from the sale of miniature horse and her income tax returns (her tax returns reported significantly lower amounts of horse sale income than do her alleged damages).  Similarly, Brooks, in spite of this Court's order of October 31, 2006, did not produce any cancelled checks for the sale or purchase of horses, did not produce any documentation to verify her alleged veterinary bills, and

15

also had a problem reconciling her tax returns with her alleged damages.  Suffice it to say, in general, Brooks did not produce any additional documentation of her alleged damages.

While they have added to their factual discussion, Defendants make no new *legal* arguments in their amended motion.  Thus, the bases on which they seek to limit the Plaintiffs' damages remain the same.

### 1.    Lost Profits Damages

In response to the motion, Plaintiffs' state that they are not seeking lost profits damages, and refer to their First Amended Disclosures to demonstrate this.  *See* Plaintiffs' Memorandum of Law (Clerk's Doc. No. 68).  While it is no doubt true that there is not a category of damages contained in the amended disclosures entitled "lost profits," the disclosure does list two categories of damages under headings that sound an awful lot like lost profits: (1) Lost Value of Horses Infected with Strangles and (2) Lost Business and Good Will.  While good will is an independent concept from profits, "lost value of horses" and "lost business" sound suspiciously like lost profits dressed up in different language.  This is problematic because, as Defendants correctly point out, Plaintiffs have continually failed to produce any summary judgment evidence or documentation of past profits from either of the horse farms.  While they did produce what looks to be a year-by-year calculation of horses bought and sold, *see* Exh. C of Defendants' Motion to Show Cause filed Nov. 20, 2006 (Clerk's Doc. No. 74),[7] the correct measure of lost profits under Texas law is net profits, not gross profits.  *Holt Atherton v. Heine*, 835 S.W.2d 80, 87 n.1 (Tex 1992).  Moreover, Plaintiffs' only

---

[7]Defendants also state that "Plaintiffs provided a summary in which they attempted to determine the gross value of their horses, but made no attempt to offset the value with the costs of the operation."  *See* Defendant Blanco Veterinary Clinic, Inc.'s Motion for Partial Summary Judgment Damages(Clerk's Doc. No. 53 at p. 6).  However, they offer no record citation for this.

response to the motion on this point is to contend that they are not seeking lost profits as a measure of damages. Because Plaintiffs have not produced any documentation of lost (net) profits, and have failed to make a substantive response to the motion, the Court recommends to the District Court that it grant Behrends' motion for summary judgment on this issue, and that Plaintiffs be barred from presenting at trial any evidence of lost profits, regardless of the name under which they might seek such damages.

### 2.      Mental Anguish Damages

Defendants argue that Plaintiffs have not shown the requisite degree of mental pain and distress for mental anguish damages, and that their anguish amounts to little more than frustration that their respective horse farms experienced a strangles outbreak. To be compensable, mental anguish must involve a relatively high degree of mental pain and distress. It must consist of more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these elements. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995); *see also Stevens v. National Educ. Centers, Inc*., 11 S.W.3d 185, 185-186 (Tex. 2000) (question asking jury to assess damages for past and future "mental anxiety, humiliation and embarrassment" was defective). It includes a mental sensation of pain resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, and public humiliation. *Trevino v. Southwestern Bell Tel. Co.*, 582 S.W.2d 584 (Tex. App. – Corpus Christi 1979, no writ); *see Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (Court applied traditional definition of mental anguish despite fact that it is "somewhat unwieldy" and "admittedly nebulous").

Mere anger is insufficient to support a recovery for mental anguish damages, even if the anger is severe. *Cronin v. Bacon*, 837 S.W.2d 265, 269 (Tex. App. – Fort Worth 1992, den.) (fact

that plaintiff was "[p]robably about as angry as [he had] ever been" was insufficient to support mental anguish award). Similarly, mere sadness is insufficient to support an award of mental anguish damages. *Worsham Steel Co. v. Arias*, 831 S.W.2d 81, 87 (Tex. App. – El Paso 1992, no writ) (evidence that wrongfully discharged employee was "very sad" was insufficient to support mental anguish award). Mere worry, anxiety, vexation, resentment, or embarrassment also does not rise to the level of compensable mental anguish. *Phar-Mor, Inc. v. Chavira*, 853 S.W.2d 710, 713 (Tex. App. – Houston [1st Dist.] 1993, den.). Likewise, feeling "hurt" has been held to be a "lesser emotion" than anger, resentment, and embarrassment, and thus insufficient to support an award of damages for mental anguish. *Nix v. Born*, 870 S.W.2d 635, 641 (Tex. App. – El Paso 1994, no writ). In other words, to support an award of mental anguish, a party must present either direct evidence of the nature, duration, and severity of his or her mental anguish, thereby establishing a substantial interruption in his or her daily routine, or circumstantial evidence of a high degree of mental pain and distress that is greater in degree than mere worry, anxiety, vexation, embarrassment, or anger. *Parkway v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995); *Minnesota Life Ins. Co. v. Vasquez*, 133 S.W.3d 320, 324-325 (Tex. App.– Corpus Christi 2004, pet. filed) (evidence can come from testimony of injured person).

As noted above, Krug testified that as a result of this outbreak, she experienced "loss of sleep, being very anxious and very emotional, very – just rot out, the no sleep, anxiety over what was happening, whether you would walk into the barn and find somebody dead in the morning," *see* Exh. B8, Krug Deposition at 90, 98, and that a doctor prescribed anti-anxiety medication. Krug also testified that she experienced marital difficulties, partly because of the cost of treating the animals. *Id*. at 91-95. Evidence of marital discord, even for a brief time, may be sufficient to show a

18

substantial disruption in the plaintiff's daily routine and great distress. *Wyler Indus. Works, Inc. v. Garcia*, 999 S.W.2d 494, 509 (Tex. App. – El Paso 1999, no pet.). Brooks experienced some similar problems, testifying that she "went through [her] whole 401(k)," that the experience of having strangles on her farm was "overwhelming . . . it's just what I went through during the time was unbelievable, sick horse after sick horse, copious amount of money going out that I didn't have." Exh. B8, Brooks Deposition at 83-84. She further testified that she "went through from losing all my money to major depression and worrying about how in God's name am I going to pay my bills." *Id*. She also testified that she did not seek any medical treatment because she could not afford to purchase medical insurance. *Id*. at 85.

The Plaintiffs have produced enough evidence to establish a genuine issue of material fact as to mental anguish damages. If the Court were to grant summary judgment on mental anguish damages, it would be making an impermissible credibility determination as to Plaintiffs' level of mental anguish. This is an issue for the jury to resolve. Accordingly, it is recommended that summary judgment be denied on the issue of mental anguish damages.

### 3.    Lost Wages

Defendants also argue that Plaintiffs are not entitled to lost wages damages. The sole basis of their argument is that the amount of lost wages claimed by Brooks and Krug[8] is not an amount "that would be 'reasonably anticipated' for caring for sick horses." *See* Clerk's Doc. No. 53 at 6-7. However, Defendants cite no applicable case law to back up this bald assertion.[9] And while the

---

[8]Brooks seeks $57,687.50 (and counting) in lost wages, and Krug is seeking $8,862.00 (and counting).

[9]There is a citation to *Calvit v. McFadden*, a Texas Supreme Court case from 1855 that held that where the defendant failed to deliver the number of cattle he was required to under a contract,

amended motion includes additional factual information that might form the basis for an argument that Plaintiffs have failed to offer sufficient evidence to demonstrate that they have actually lost income, that is not the ground on which the motion states that the Defendants are moving for summary judgment. Rather, the sole ground stated in the motion is that the amounts could not have been reasonably anticipated by Defendants. Given that the Defendants are a veterinarian and his practice, they would surely have understood how time consuming it would be to care for a herd of horses infected with strangles. Because Defendants have the burden at summary judgment, and because they have failed to show that they are entitled to judgment as a matter or law on the specific ground raised in their motion, their motion for summary judgment as to lost wages damages should be denied.

## IV. ORDER AND RECOMMENDATION

The Court **DENIES** Defendants Blanco Veterinary Clinic, Inc's, David Behrends, D.V.M.'s and Peter and Lisa Goettl's Motion to Exclude Plaintiffs' Expert Witness  (Clerk's Doc. No. 40).

The Magistrate Court **RECOMMENDS** that the District Court **DENY** Defendants' Motion for Summary Judgment (based on causation) (Clerk's Doc. No. 52).

The Court **FURTHER RECOMMENDS** that the District Court **GRANT IN PART, AND DENY IN PART** Defendant Blanco Veterinary Clinic, Inc's and David Behrends, D.V.M.'s Motion for Partial Summary Judgment on Damages (Clerk's Doc. No. 53).  It is recommended that the motion be **GRANTED** as to lost profits damages, and **DENIED** as to mental anguish damages and lost wages damages.

---

"the increase of the cattle are not to be estimated in computing the [plaintiff's] damages resulting from the breach." 13 Tex. 324 (1855). This case is not a strong authority for the proposition that lost wages as the result of caring for horses with strangles cannot be reasonably anticipated.

## V.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 12th day of December, 2006.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE